**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **RYAN E. DALES,** | * | **CRIMINAL NO. GLR-23-026** |
| | * | |
| **Defendant.** | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS AND
MOTION TO SEVER**

The United States of America respectfully submits this Response in Opposition to the Motion to Suppress and Motion to Sever filed by Defendant Ryan Dales in this matter. ECF Nos. 48, 50. For the following reasons, the Court should summarily deny the Motions without a hearing.

**FACTUAL BACKGROUND**

This matter arises out of Defendant's receipt of fraudulently-obtained funds and property in connection with various fraud schemes, along with Defendant's possession of two firearms (including an unserialized "ghost gun") and fentanyl, which were seized during a January 20, 2023 search of Defendant's residence located at 900 E. Fort Avenue, Apt. 537—the "Anthem House," a luxury apartment building in the Locust Point area of Baltimore City.

**A. Defendant's Fraudulent UI Claim.**

Defendant's UI scheme began while he has living in a Volunteers of America (VOA) half-way house serving a federal sentence in connection with a November 2017 federal conviction in the District of Maryland for Bank Fraud Conspiracy in violation of 18 U.S.C. § 1349 (Count One) and Aggravated Identity Theft in violation of 18 U.S.C. § 1028A(a)(1) (Count Five), *see United*

*States v. Ryan Dales*, GLR-17-0060;[1] *see also* Ex. 1 (Gorman Aff.) at 8.   On May 3, 2019, Defendant was sentenced to 38 months' imprisonment as to Count One and 24 months' imprisonment, consecutive, as to Count Five.   *Id.*   Defendant lived at VOA from December 9, 2020, to his release date of June 4, 2021.   *Id.*   Upon completion of his sentence, Dales began his supervised release. *Id.*

Shortly after he began residing that VOA halfway house, on December 15, 2020, Dales submitted electronically to the Maryland Department of Labor (DOL) an application seeking UI benefits falsely claiming that (1) Defendant's occupation was as a barber, (2) he stopped being able to provide services in April 2020, and (3) listed an email address of theycallmedales@gmail.com.   *Id.* at  8-9.   The DOL ultimately rejected the claim.   *Id.* at 9.

Six months later, on July 30, 2021, Defendant reopened his claim for UI benefits seeking benefits under the PUA program[2] and in support of the application uploaded electronically a false and fraudulent Internal Revenue Service (IRS) form for a purported business known as the "KNW Group."   *Id.* at 10-12.   As a result of the fraudulent application, the Maryland DOL between August and September 2021, paid Defendant $25,570 in UI funds.   *Id.* at 12.

**B.  Defendant Submits Fraudulent EIDL and PPP Loan Applications.**

On December 29, 2020, Dales also submitted electronically an Economic Injury Disaster Relief (EIDL) application for "Dales Drop Inc." (Dales Drop)—a purported agricultural

---

[1] This matter involved Defendant's use of the personal identity information (PII) of various victims to obtain counterfeit identification cards such "as driver's licenses or state-issued identifications, using the victim's PII but the picture of the Defendant or a co-conspirator."   Crim. No. GLR-17-0060, ECF No. 37 (Plea Agreement) at 9. Thereafter, "Defendant and/or his co-conspirator then traveled to a retail store which offered customers 'instant credit' if approved for a store-branded credit card. These credit cards were, in fact, issued by financial institutions, which extended credit for purchases made using these cards."   *Id.*   Defendant and his co-conspirators received actual extensions of credit of approximately $241,852 in connection with their scheme.   *Id.*

[2] States are permitted to provide PUA to individuals who are self-employed, seeking part-time employment, or otherwise would not qualify for regular UI compensation. An individual must not be eligible for regular UI benefits and be unemployed, partially unemployed, or unable or unavailable to work because of certain health or economic consequences of the COVID-19 pandemic.   *Id.* at 10 n.2.

business—belonging to Dales.  *Id.*   The application contained a phone number used by Defendant and the email address theycallmedales@gmail.com.  *Id.*    The application also falsely indicated "No" to the question of whether Defendant had within the past five years, among other things, been placed on any form of probation or parole.  *Id.* at 13.  The fraudulent EIDL application was ultimately denied.  *Id.*

Dales also electronically submitted an application for a Paycheck Protection Program (PPP) loan to Cross River Bank on or around March 24, 2021, for a purported sole proprietorship owned by Defendant.  The application asserted over $8,000 in average monthly payroll for the sole proprietorship, and sought more than $20,000 in funds for "payroll, rent/mortgage interest, utilities, and covered operations, expenditures, and covered supplier costs."  The application listed a business start date of "08/2018"—a time when Defendant would have been incarcerated.  *Id.* at 14.  Moreover, the application included a purported IRS tax form which stated that Defendant's "principal business" was "home improvement" and that falsely answered "Yes," to the question whether Defendant did "materially participate in the operation of this business during 2019."  *Id.* Defendant was incarcerated during the entirety of 2019.  *Id.*   The PPP application likewise listed email address theycallmedales@gmail.com.[3] *Id.*  The loan ultimately did not close.

**C. Execution of Search Warrants On January 20, 2023, Arrest Of Defendant, And Defendant's Confession.**

On January 20, 2023, law enforcement executed a federal search warrant at Defendant's residence located at 900 E. Fort Avenue, Apt. 537, Baltimore, Maryland 21230. That warrant was previously authorized by the Honorable J. Mark Coulson on January 18, 2023; it authorized the

---

[3] Law enforcement obtained a federal search and seizure warrant for this account, among others.  *Id.* at 15-17.  *See* Exs. 2 (Google), 3 (Google and Apple).

seizure of evidence, fruits, and instrumentalities of violations of Wire Fraud (18 U.S.C. § 1343). *See, e.g.* Ex. 1 at 4, 15 (Affidavit at 5).

That same day, law enforcement arrested Defendant pursuant to an arrest warrant.[4] During the execution of the search warrant for Defendant's residence on the morning of January 20, 2023, law enforcement observed in plain view two firearms and suspected drugs in plain view. They then that same day sought and obtained a warrant to seize these items, as well as other evidence relating to Felon in Possession of a Firearm (18 U.S.C. § 922(g)); Possession With Intent to Distribute a Controlled Substance (21 U.S.C. § 841(a)(1)). Ex. 4 (Baugh Affidavit).

During the searches pursuant to the warrants, law enforcement ultimately located and seized numerous items relating to Defendant's fraud schemes and his illegal possession of firearms and drugs, including: (1) two loaded firearms, one which was stolen and one which was a privately-made "ghost gun" Polymer80 firearm with no serial number;[5] (2) numerous packages of suspected controlled dangerous substances—including suspected fentanyl;[6] (3) multiple digital scales, sifters, empty capsules, drug packing materials, and suspected cutting agents; (4) six mobile devices ; (5) multiple computers; (6) an embosser and ID card printer; (7) laminate sheets with security holograms; (8) gift cards in various denominations; (9) bulk packages of shrink-wrapped white PVC cards; and (10) three purported South Carolina identification cards containing PII of individual victims but Defendant's photograph.[7]

---

[4] On January 13, 2023, Defendant was charged by Criminal Complaint in the U.S. District Court for the District of Maryland, and an arrest warrant was issued. *See* BAH-23-MJ-190, ECF No. 1.

[5] Defendant's DNA was later determined to be present on both firearms.

[6] These items were later confirmed by lab results to be drugs—*i.e.*, fentanyl and a very small amount of cocaine base.

[7] These counterfeit identification cards were all used in connection with the Wire Fraud and Aggravated Identity Theft scheme charged in Counts Five to Eight of the Superseding Indictment.

That same day, Defendant was transported to the FBI Baltimore Field Office and, after voluntarily waiving his *Miranda* rights, agreed to speak to agents.  He acknowledged, among other things, that he was currently on federal supervised release and was not permitted to be in possession of firearms.  He further stated regarding the firearms that "they are with me."  He also told law enforcement that at least some of the suspected CDS in his apartment was probably fentanyl.  And Defendant told investigators, among other things, that he purchased the personally identifiable information (PII) of at least 10 individuals on the dark web.

### PROCEDURAL HISTORY

On January 25, 2023, Defendant was indicted by a federal grand jury in the District of Maryland with Wire Fraud, in violation of 18 U.S.C. § 1343 and Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1).  ECF No. 15.  The Wire Fraud charges pertained to Defendant's receipt of fraudulent UI benefits.  *Id.* at 1-4.

On May 17, 2023, the grand jury returned a Superseding Indictment, charging Defendant with additional counts of Wire Fraud (Counts Five to Seven), a related Aggravated Identity Theft count (Count Eight), as well as Possession With Intent to Distribute Fentanyl, in violation of 18 U.S.C. § 841(a)(1) (Count Three) and Possession of a Firearm in Furtherance of a Drug Trafficking Activity, 18 U.S.C. § 924(c)(1)(A)(i) (Count Four).  ECF No. 35.  The new Wire Fraud charges relate to Defendant's scheme to obtain high-end lawn mowers on credit using victim PII and counterfeit IDs for the purpose of reselling the lawnmowers for cash.  *Id.* at 8-12.  The drug and related firearm charges arose out of the results of the search of Defendant's residence on January 23, 2023.

On October 10, 2023, Defendant filed the instant motions.  *See* ECF Nos. 48 (Motion to Suppress), 50 (Motion to Sever).

## ARGUMENT

### A.  Defendant's Motion To Suppress Should Be Denied.

As an initial matter, Defendant has moved to suppress the initial warrant (Ex. 1, Gorman Affidavit) authorizing law enforcement to seize evidence from Defendant's residence at 900 E. Fort Avenue, Apt. 537 in Baltimore.   ECF No. 49.   The probable cause supporting the warrant, Defendant says, is now stale.  *Id.* ("All of the probable cause in the affidavit relates activity [sic] prior to September 2021).  He further claims that the good faith exception does not apply. Defendant is wrong, and the Court can easily deny Defendant's motion.

### 1.  The Warrant Authorizing The Search of Defendant's Home Was Supported By Probable Cause.

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

"Probable cause exists when, 'given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Cobb*, 970 F.3d 319, 326 (4th Cir. 2021) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)).   "Probable cause requires only 'the kind of fair probability on which reasonable and prudent people, not legal technicians,' would rely." *United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)). The task of a judicial officer "presented with an application for a search warrant is 'to make a practical, common-sense' determination of whether the sworn facts submitted in support of the application" satisfy the probable-cause standard. *Id.* A reviewing court "afford[s] 'great deference' to a

magistrate's determination that probable cause for a search had been established by reviewing whether 'the magistrate had a substantial basis for concluding that probable cause existed' to search a particular place for evidence of a specific crime." *Id.* (quoting *Gates*, 462 U.S. at 238–39).

"Probable cause is a flexible standard" that requires "less of a showing than does the formal preponderance-of-the-evidence standard." *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012). Additionally, law enforcement "may draw inferences based on [their] own experience in deciding whether probable cause exists," *Ornelas*, 517 U.S. at 700, including inferences that "might well elude an untrained person," *United States v. Cortez*, 449 U.S. 411, 418 (1981); *see also United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("And as we show deference to inferences that a resident judge draws from the factual circumstances, we show similar respect to the inferences drawn by law enforcement officers on the scene.").

Here, there is no question that Special Agent Gorman's Affidavit established probable cause to search Defendant's home for evidence of Wire Fraud in violation of 18 U.S.C. 18 U.S.C. § 1343, as Judge Coulson concluded when he authorized the warrant.[8] Defendant does not argue to the contrary.

As an initial matter, law enforcement had probable cause to believe that Defendant used electronic devices in connection with his alleged criminal activity and that those devices—among other evidence including financial records—would be found in Defendant's residence.

As detailed in the Gorman Affidavit, the applications submitted in connection with Defendant's scheme were all submitted electronically. Ex. 1 ¶¶ 17; 30 ("All loan applications and supporting documents were submitted by DALES to MD DOL or the SBA (or through SBA

---

[8] FBI Special Agent Summer Baugh, upon seeing firearms and suspected drugs during the search of the residence, swore out a warrant authorizing its search for evidence of firearms and drug offenses. *See* Ex. 4.

authorized lenders) electronically via the internet, causing interstate wire communications to be sent in furtherance of the scheme to defraud."); 44.  An email address belonging to Dales (theycallmedales@gmail.com) was used in connection with each of the applications.  *Id.* ¶¶ 32 (UI application); 45 ( EIDL application); 51 (PPP application).  And Defendant's phone number was used in connection with the EIDL and PPP applications.  *Id.* ¶¶ 44-45, 52.  Fraudulent and fake IRS documents were uploaded electronically in support of the UI claim.  *Id.* ¶¶ 34, 41.  And an apparently fraudulent IRS document was uploaded in support of the PPP claim too.  *Id.* ¶ 53.

All of these electronic records—the electronically submitted applications, emails concerning the submission of applications or the payment of benefits,[9] the documents (including fake IRS records submitted in support of the applications) and other data from electronic devices, including attribution information that linked Defendant to the email address or phone number used in connection with the applications (his phone number)—would all constitute evidence of the charged crime.

Nor is there any question that law enforcement had probable cause to believe that Defendant's home contained relevant electronic evidence (in addition to other non-electronic evidence), including Defendant's phone.  For instance, the very same phone listed on the fraudulent PPP and EIDL applications, was active and in use and, accordingly, likely to be in Defendant's residence, which it was.  Indeed, it was (1) used by Defendant to communicate with his Probation Officer, *id.* ¶ 45; (2) according to T-Mobile "Active" as of December 4, 2022, *id.* ¶ 68; (3) used to communicate with the Anthem House—the building in which Defendant's residence was located, *id.*; and (4) associated with various Google and Apple iCloud accounts

---

[9] As noted in the Affidavit, a review of returns from the warrant obtained from Google for theycallmedales@gmail.com—the account used in connection with the UI , EIDL, and PPP applications—revealed the existence of, among other things, "multiple emails with the Maryland Department of Labor regarding UI" and "emails in which DALES was being warned that he had an insufficient funds balance or was declined for lines of credit with Wells Fargo and Navy Federal Credit Union." Ex. 1 at ¶ 57.

linked to Defendant, *id.* ¶¶ 56, 64, 69.  Further, as a matter of common sense, and as confirmed by Agent Gorman's knowledge, training, and experience,[10] people carry "their cellular telephone with them virtually everywhere they go." *Id.* ¶ 71.  The Gorman Affidavit likewise spelled out in detail the various ways that electronic devices, based on his knowledge, training, and experience, are used in connection with criminal activity, including fraud.  *Id.* ¶¶ 6-11.

What's more, Agent Gorman had probable cause to believe that Defendant's crimes were ongoing.  A review of the Apple iCloud warrant return for the account ryanedales@gmail.com— one of the cloud-based back-up accounts linked to Defendant's telephone—revealed the existence of fictitious Maryland and South Carolina driver's licenses containing, as well as dozens of "driver's license or mug-shot style photographs of individuals who were not DALES. Several of these photographs were also found on separate images of Driver's Licenses or State Identification (ID) cards. Some of the ID cards contained the same photo, but different Personally Identifiable Information (PII) listed on the ID."  *Id.* ¶ 66.  Law enforcement likewise located in the iCloud backup account at least one apparent fictitious earnings statement in the name of Defendant.  *Id.* ¶ 65.

Again, the UI, EIDL, and PPP applications submitted by Defendant contained "false statements and misrepresentations regarding DALES, his employment, and purported businesses. At times, the applications included fabricated documents, including fake and fraudulent Internal Revenue Service (IRS) tax records." *Id.* ¶ 29.  Moreover, the Gorman Affidavit noted Defendant's past federal convictions for Bank Fraud and Aggravated Identity Theft, the 62 month sentence imposed by this Court in May 3, 2019, and the fact that the submission of the fraudulent UI

---

[10] Such specialized experience training and experience of law enforcement agents bears significantly in probable cause determinations.  *See, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (reviewing courts must "allow[] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'") (citations omitted).

application submission was submitted when Defendant was still under the supervision of the Bureau of Prisons. *Id.* ¶¶ 25-29. And, at the time of the search, Defendant was residing at a luxury two-bedroom apartment with a monthly rent of over $3,000. *Id.* ¶ 72. Based on all this, there was more than ample probable cause to believe that upon being released from incarceration after his past federal Bank Fraud and Aggravated Identity Theft convictions that Defendant immediately resumed his criminal activity and that it was ongoing.

Under these facts, the totality of circumstances make plain that "there is a fair probability that contraband or evidence of a crime" *United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020), would be found in Defendant's residence. The existence of probable cause is confirmed by Judge Coulson's decision to sign a warrant authorizing a search of Defendant's residence based on his own independent determination of probable cause—a determination accorded "great deference," and which is reviewed only to determine whether the magistrate judge had a "substantial basis" for the determination. *Id.* That standard is easily met here.[11]

### 2. The Facts Supporting Probable Cause Were Not Stale.

Nor, contrary to Defendant's contention, was the information supporting the finding of probable cause stale.

"Evidence seized pursuant to a warrant supported by 'stale' probable cause is not admissible in a criminal trial." *United States v. Ebert*, 61 F.4th 394, 401 (4th Cir. 2023) (quoting *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984)). In its assessment, a court must consider whether the facts supporting probable cause are "so closely related to the time of the issuance of the warrant as to justify a finding of probable cause at that time." *Id.* (citing *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984)). Although "time is a crucial element . . .

---

[11] Indeed, Defendant does not contend otherwise—he only maintains that the information supporting the finding of probable cause was stale.

the existence of probable cause cannot be determined by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." *Id.* (cleaned up). Instead, a court "look[s] to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." *Id.*; *see also United States v. Farmer*, 370 F.3d 435, 439 (4th Cir. 2004) (explaining that staleness is not measured "by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit"); *United States v. Rhynes*, 196 F.3d 207, 234 (4th Cir. 1999) (evidence in support of home and business not stale where some of the information concerned criminal activities that had occurred more than three decades earlier and the most recent information occurred two years before the warrant was issued). All of the facts and circumstances of the case demonstrate that the information in the Gorman Affidavit was not stale.

*First*, as to "the nature of property to be seized," courts have repeatedly held that a warrant seeking evidence relating to records on electronic devices is unlikely to be stale given the nature of electronic storage. As the Fourth Circuit has put it, "'[s]taleness is highly relevant to the legality of a search for a perishable or consumable object, like cocaine, but rarely relevant when it is a computer file." *United States v. Bosyk*, 933 F.3d 319, 331 (4th Cir. 2019) (quoting *United States v. Seiver*, 692 F.3d 774, 775–78 (7th Cir. 2012)). Indeed, "digital media files persist for a long time and can often be forensically recovered even after being deleted." *Id.* (citing *United States v. Richardson*, 607 F.3d 357, 361, 371 (4th Cir. 2010)); *see also United States v. Gerace*, No. 19-CR-227 (JLS) (MJR), 2022 WL 17478270, at *6 (W.D.N.Y. Aug. 5, 2022), *report and recommendation adopted sub nom. United States v. Bongiovanni*, No. 19-CR-227 (JLS), 2022 WL 17139489 (W.D.N.Y. Nov. 22, 2022) (rejecting staleness argument and reasoning that "the cell phone seized from Gerace had the ability to retain large amounts of personal data, photographs, communications, and other records for long periods of time. Moreover, a cell phone is not the

type of evidence that rapidly dissipates or degrades"); *United States v. Feng Ling Liu*, No. 12-CR934 (RA), 2014 WL 101672, at *7 (S.D.N.Y. Jan. 10, 2014) (rejecting staleness argument and reasoning that "because the storage of electronic files is inexpensive and because even deleted files can be recovered, electronic evidence of fraud was likely still present on computers and storage media at the [location to be searched]").

Here, evidence of Defendant's schemes—schemes which required the use of electronic devices through the submission of applications and uploading of documents, among other things—would likely be found on an electronic device or devices located at Defendant's residence no matter how long ago the schemes occurred.  And the nature of electronic data storage—including the use of Cloud-based accounts  such as iCloud and web-based apps on electronic devices—easily supports the finding that the information in the Gorman Affidavit was not stale in light of the nature of the property to be seized, which included electronic devices, Ex. 1 at 43, as well as records "*stored in any form, including electronic or digital form, and by whatever means they have been created and/or stored*," *id.* at 44.  Indeed, the Gorman Affidavit likewise noted that even if information is deleted from a device, that "[d]ata on [it] can provide evidence of a file that was once on the storage medium but has since been deleted or edited or of a deleted portion of a file." *Id.* at ¶ 43.

In addition to electronics and electronic records and data, the warrant authorized seizure of records—electronic or otherwise—relating to, among other things, UI, PPP, and EIDL applications, IRS records, as well as various financial records.  *Id.* at 42-43.  There was likewise probable cause to believe that this evidence (even if in hard copy) would be found in Defendant's residence.  Indeed, Special Agent Brian Gorman, based on his training and experience, noted that

it was common for one who commits fraud to keep documents and records relating to the fraud — and particularly financial records—in readily accessible locations including in secure location or containers within the person's residence. *Id.* at ¶¶ 10-13.

These are precisely the sort of documents and records that are not "ordinarily destroyed or moved." *United States v. Njokem*, No. RDB-21-0338, 2022 WL 17105172, at *2 (D. Md. Nov. 22, 2022) (rejecting staleness argument in UI fraud case where the nature of the property sought included "victims' personally identifiable information, *financial documents, debit and credit cards*") (emphasis added). *Accord United States v. Farmer*, 370 F.3d 435, 439-40 (4th Cir. 2004) (records of payment, bank statements, canceled checks, receipts, and phone records unlikely to be come stale); *see also United States v. Ali*, 870 F. Supp. 2d 10, 33–34 (D.D.C. 2012) (rejecting staleness argument premised on information in search warrant applications 15 months and two years old and reasoning that "where a warrant targets documentary materials such as business records, for example, staleness presents less of a concern because these are the type of records typically found to be maintained over long periods of time. Where the records or documents in question are digital, staleness is even less of a problem. Digital files remain on computers for extensive periods of time, such that the passage of time does not necessarily render the evidence stale") (collecting authority) (cleaned up).

*Second*, as to "the nature of the unlawful activity alleged," courts routinely conclude that information is not stale where, as here, the alleged criminal activity was ongoing in nature over a period of time or reflect a pattern of activity and not mere "isolated violations of the law." *Farmer*, 370 F.3d at 439 (holding that evidence was not stale even though events supporting probable cause took place nine months before search warrant in connection with large scale counterfeiting operation was issued); *United States v. Dowdell*, 546 F. App'x 128, 133 (4th Cir. 2013) (per curiam) (noting that "[c]ourts routinely reject staleness arguments in the face of ongoing and

continuous criminal activities").  Judge Bennett recently rejected the precise argument Defendant

makes here in the context of an UI fraud scheme, concluding that the

> alleged crimes were ongoing and continuous, that the length of the alleged crimes
> lasted more than six months, and that evidence of [UI] benefits fraud is not
> diminished by the passage of time.  Further, the nature of the property sought by
> the search warrant, including victims' personally identifiable information, financial
> documents, debit and credit cards, is not the type that is ordinarily destroyed or
> moved.

*United States v. Njokem*, No. RDB-21-0338, 2022 WL 17105172, at *2 (D. Md. Nov. 22, 2022)

(rejecting staleness argument premised on "facts dating back to June 2020" in connection with

federal search warrant issued in February 2021); *see also United States v. Raymonda*, 780 F.3d

105, 114 (2d Cir. 2015) (information is not stale, even after the passage of a significant period of

time, if "the affidavit establishes a pattern of continuing criminal activity, such that there is reason

to believe that the cited activity was probably not a one-time occurrence"); *United States v. Singh*,

390 F.3d 168, 181-82 (2d Cir. 2004) (20-month-old information about a healthcare scheme not

stale) (citing *Farmer*, 370 F.3d at 439-40)); *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir.

1990) (no staleness from eighteen-month delay between the informant's statement and wiretap

application in a narcotics conspiracy); *United States v. Wells*, No. 20-CR-633, 2021 WL 5401494,

at *5 (S.D.N.Y. Nov. 18, 2021) (fourteen-month-old information about bank fraud and identify

theft activity that "span[ed] many months" and "was part of a broader pattern of fraudulent

conduct" not stale).

Here, the information in the Gorman Affidavit established a lengthy pattern—a pattern

spanning back to the conduct underlying Defendant's previous federal convictions—of Defendant

obtaining and attempting to obtain money and property by means of fraud and identity theft.

The Gorman Affidavit included information pertaining to (1) Defendant's fraudulent

December 2020 UI claim, Ex. 1 ¶¶ 31, 32; (2) the reopening of the claim on July 31, 2021 and

Defendant's submission of fraudulent documents in support of the claim, *id.* ¶¶ 33-41; (3) Defendant's receipt of fraudulent funds during the time period of August 2021 to September 2021, *id.* ¶¶ 42-43. The Affidavit likewise included information pertaining to Defendant's attempt to obtain a fraudulent EIDL on December 29, 2020. *Id.* ¶¶ 44-50. It included information pertaining to Defendant's submission of a fraudulent PPP loan application on March 24, 2021 and his submission of a suspected fraudulent document in support of that application too. *Id.* ¶¶ 51-55. The Gorman Affidavit included information concerning Defendant's past federal convictions for Bank Fraud and Identity Theft, *id.* ¶¶ 25-27; and, again, it further noted that a review of the warrant return from Defendant's iCloud account indicated the existence on the account of at least one apparent fictitious earnings statement in the name of Defendant, images of fictitious Maryland and South Carolina driver's licenses, as well as dozens of "driver's license or mug-shot style photographs of individuals who were not DALES" including purported ID cards containing the same photo but different PII. *Id.* ¶ 66. A common-sense reading of the Affidavit likewise indicated that Defendant had access to funds sufficient to for a time pay rent in the amount of over $3,000 per month. *Id.* ¶ 72.

Under these circumstances—and based on the totality of circumstances in this case—there was at a minimum a substantial basis for Judge Coulson to conclude that Defendant's criminal activity was not simply a one-time occurrence and that information about both prior and ongoing crimes would be found at Defendant's residence, which it was. Defendant's staleness argument therefore fails.

### 3. The Good Faith Exception Applies.

In any event, even if Defendant could demonstrate that Judge Coulson erred and that there was no probable cause to search Defendant's home for evidence of Wire Fraud—and Defendant has not and cannot make such a showing—suppression would still be unwarranted because the

good faith exception applies. Indeed, the Supreme Court has held that when officers seize evidence in good faith reliance on a facially valid warrant issued by a magistrate or judge, and the affidavit is later found to lack probable cause, the evidence is not subject to the exclusionary rule of the Fourth Amendment and is admissible in the government's case-in-chief. *United States v. Leon*, 468 U.S. 897 (1984) (affidavit of experienced narcotics officer who acted in reliance on information provided by informant of "unproven reliability" held to lack probable cause, but evidence seized by agent who acted in good faith reliance on the facially valid warrant was not subject to suppression); *see also United States v. Bynum*, 293 F.3d 192, 197–99 (4th Cir. 2002) (applying good faith exception where "affidavit contained sufficient indicia of probable cause so as not to render reliance on it totally unreasonable," reversing district court's suppression of evidence).

The Fourth Circuit has held that the good faith exception applies to otherwise deficient search warrants except in "egregious cases" such as "when 'the issuing magistrate wholly abandon[s] his judicial role' or when the warrant issued is 'so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.'" *United States v. Qazah*, 810 F.3d 879, 886-87 (4th Cir. 2015) (quoting *Leon*, 468 U.S. at 922-23)). The court also held that "in the ordinary course, the exclusion of evidence is not the proper remedy." *Id.*

The good-faith exception applies in most cases, except those where the affidavit provides only minimal, vague information. *Cf. United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996) ("We find that the good-faith exception to the exclusionary rule should not apply in this case due to the 'bare bones' nature of the affidavit[.]"). Indeed, "[s]earches pursuant to a warrant . . . rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *United*

16

*States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994) (internal quotation marks omitted).  The Supreme Court has noted "four situations in which an officer's reliance on a search warrant would not be reasonable," that is, where the "good faith exception" would not apply:

> (1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth;
>
> (2) the magistrate wholly abandoned his detached and neutral judicial role;
>
> (3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and
>
> (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid.

*United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995).

None of these situations comes even close to applying here.   No aspect of the Gorman Affidavit or warrant was deficient, and it was not unreasonable for law enforcement to rely in good faith on it.  Indeed, the facts in the Affidavit clearly establish probable cause that evidence related to Wire Fraud would be found at the location to be searched—Defendant's residence.  Defendant does not establish, or even allege, any grounds on which the supposed deficiency of the warrant render law enforcement's reliance on the warrant objectively unreasonable, and in fact—apart from a single sentence—does not address the good faith exception at all.

Because the warrant was supported by probable cause and based on information that was not stale and the officers acted in good faith in securing and executing the warrant, Defendant's motion to suppress should be denied.[12]

---

[12] Defendant's motion to suppress his confession to law enforcement after his arrest on the morning of the search, ECF No. 49 at 4, should therefore be denied too.

**B. The Motion to Sever Should be Denied.**

Defendant argues that severance is warranted, and thus that he should be granted *three trials* rather than one. ECF No. 50. He maintains that the charges he faces are based on three distinct and unrelatable kinds of criminal conduct and thus that severance is warranted. ECF No. 50 at 1. Defendant is wrong.

**1. Joinder was Proper.**

Under the Federal Rules of Criminal Procedure, an indictment "may charge a defendant in separate counts with two or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).

The Fourth Circuit has interpreted the latter two prongs of Rule 8(a) flexibly, requiring only that the joined offenses have a "logical relationship" to one another. *United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir. 2005). In defining the bounds of a "logical relationship," the Fourth Circuit has noted "[s]uch a relationship exists when consideration of discrete counts against the defendant paints an incomplete picture of the defendant's criminal enterprise." *Id.* (internal quotations omitted). Because of "the prospect of duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources," joinder of related offenses is the rule rather than the exception. *United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008). Indeed, there is "a strong interest in favor of joinder of offenses," *United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000), and joinder under Rule 8 does not impose an onerous set of requirements, *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003).

When joinder under Rule 8(a) is proper, "the defendant's only recourse is to convince the Court that the charges should be severed under [Fed. R. Crim. P. 14]—a difficult task." *United States v. Blair*, 661 F.3d 755, 768 (4th Cir. 2011) (citing *Cardwell*, 433 F.3d at 387) (incidents

where joinder of offenses is proper but severance is nevertheless required limited to "rare" case where joinder would "prevent the jury from making a reliable judgment about guilt or innocence")). "A defendant making a motion for severance has the burden of making a strong showing of prejudice, and it is not enough to simply show that joinder makes for a more difficult defense." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984) (internal citations omitted).

Here, Wire Faud as charged in Counts One, Five, and Seven of the Superseding Indictment (along with a related Aggravated Identity Theft as charged in Count Eight). Simply put, joinder of charges for violating the *same statute* is "an unremarkable example of offenses of the 'same or similar character.'" *Hawkins*, 776 F.3d at 208.[13] This alone is sufficient to satisfy Rule 8(a)'s same or similar standard. *See United States v. Hersh*, 297 F.3d 1233, 1241 (11th Cir. 2002) ("[W]hen offenses are joined under Rule 8(a) by virtue of their 'same or similar character,' the offenses need only be similar in category, not in evidence."); *United States v. Coleman*, 22 F.3d 126, 133 (7th Cir. 1994) ("[The 'same or similar character'] language in Rule 8(a) is a rather clear directive to compare the offenses charged for categorical, not evidentiary similarities."); *id.* at 134 ("[J]oinder under Rule 8(a) was appropriate because [the defendant] was charged with four counts of possession of a firearm, identical 922(g)(1) offenses which could only vary in time and location but not in their essential elements."); *United States v. Gooch*, 665 F.3d 1318, 1325 (D.C. Cir. 2012) (holding that where only one defendant is involved, joinder is permitted under Rule 8(a) "even if [the offenses] are entirely unrelated to each other").

---

[13] The *Hawkins* court limited its analysis only to whether the alleged offenses were "of the same or similar character." *Id.* at 701. The government charged Hawkins with two counts related to an armed carjacking and one count of being a felon in possession of a firearm. *Id.* Different firearms, however, were used in each alleged crime. *Id.* The Circuit did not address the other prongs of Rule 8(a).

But even if it weren't, both the Wire Fraud scheme charged in Count One and the Wire Fraud/Identity Theft scheme charged in Counts Five through Eight involve Defendant's use of fictitious documents and multiple misrepresentations to obtain money or property by means of fraud. *See* ECF No. 35, Count One ¶¶ 8, 11 (noting that Defendant "submitted a fictitious tax form in connection with this claim for UI benefits"); Counts Five through Seven ¶¶ 8-20 (discussing Defendant's use of fraudulent driver's licenses and multiple misrepresentations). Defendant's use and creation of false documents in an attempt to obtain money or property is his well-established *modus operandi*. Indeed, his past federal convictions involved similar conduct – bank fraud and identity theft. All of these charges of the "same or similar character" under Rule 8(a). *See, e.g.*, *United States v. Robinson*, 294 F. App'x 630, 632 (2d Cir. 2008) (summary order) (concluding that bank fraud, mail fraud, wire fraud, and interstate transportation in stolen securities charges were all properly joined under Rule 8(a) because they were "of the same or similar character"); *United States v. Levine*, 983 F.2d 165, 167 (10th Cir. 1992) (finding joinder of bank fraud and mail fraud charges to be of the "same or similar character" because the indictment alleged that the defendant "attempted to defraud the governmental entities with falsified receipts, and attempted to defraud his bank through falsified loan documentation").

As for Defendant complaint of misjoinder on the basis of the extent of time – approximately 11 months—between his schemes to defraud, ECF No. 50 at 5, it matters not. No Fourth Circuit or Supreme Court precedent suggests that passage of less than a year between two otherwise similar incidents leading to criminal charges renders such charges unsuitable for joinder under the rules. *See, e.g.*, *United States v. Walker*, 403 F. App'x 803, 807 (4th Cir. 2010) (unpublished) (permitting joinder based upon facts occurring 12 months apart). Indeed, other circuits have permitted joinder in spite of longer gaps between dates of offense conduct. *See United States v. Melendez*, 301 F.3d 27, 35–36 (1st Cir. 2002) (two years between two cocaine charges); *United*

*States v. Rodgers*, 732 F.2d 625, 629 (8th Cir. 1984) (20 months between two cocaine charges). Therefore, the passage of time between the two charged Wire Fraud schemes doesn't provide Defendant a basis for his contention either.

Regarding the drug and firearms counts (Counts Two to Four), these charges arose out of the discovery of two firearms (including a "ghost gun") and fentanyl, among other things, during the execution of the search warrants at Defendant's home on January 20, 2023.  While these firearm and drug charges are not of the "same or similar character" as the Wire Fraud and attendant Aggravated Identity Theft charges, they are "connected with or constitute parts of a common scheme or plan."  Indeed, all of the offenses relate to Defendant's goal to obtain money and property however he can—through his sale of drugs (and possession of firearms) and through his various Wire Fraud and Identity Theft schemes.  Further, it is plain that the funds Defendant acquired in connection with his Wire Fraud and Identity Theft schemes to finance the rental of his apartment (which he used to package the drugs for distribution) and that he used those funds to acquire the drugs and his firearm with the hope of reselling them at a profit.

Again, joinder is proper as long as there is a logical relationship between the offenses. *United States v Campbell*, 347 F. App'x 923, 926 (4th Cir. 2009).  And Rule 8(a)'s latter two prongs are to be interpreted "flexibly."  There is no question that this low standard is met here. For instance, in *United States v. Cooper*, the Fourth Circuit affirmed the joinder of bank robbery and bankruptcy charges as parts of a common scheme. No. 96–4738, 1998 WL 29258, at *2 (4th Cir. Jan. 28, 1998).  The court held that the defendant's scheme involved stealing money from an ATM, improving his home with this money, and concealing these assets from the bankruptcy court. *Id.* The court noted that "[o]ne offense stemmed from the other" and that the defendant's "bankruptcy provided an impetus for the bank robberies which in turn gave rise to his bankruptcy fraud." *Id.*

Similarly, here, Defendant's foray into the illegal drug sale business stemmed from his earlier fraud activities and the funds obtained in connection with those activities.  But for his receipt of tens of thousands of dollars in connection of his various fraud schemes, he would not have been able to finance his drug sale business or the rental of his luxury apartment at the Anthem House in Locust Point (or its monthly rent of over $3,000, Ex. 1 ¶ 72)—which he used as a hub of his activities.  *See id.*; *see also United States v. Jamar*, 561 F.2d 1103, 1105–06 (4th Cir. 1977) (affirming the defendant's convictions on perjury, unlawful possession of a stolen check, and uttering with intent to defraud; concluding that joinder was proper because "all three counts relate to, and are logically and intimately connected together with, the theft and cashing of the treasury check") (internal quotations and citations omitted); *United States v. Dominguez*, 226 F.3d 1235, 1238-39 (11th Cir. 2000) (affirming joinder of drug charges and mortgage-fraud charges because "proof of the drug-related charges provides the motive and necessity for the mortgage fraud-related charges" and "the fact that one illegal activity provides the impetus for the other illegal activity is sufficient to constitute a common scheme for joinder purposes"); *United States v. LaRouche*, 896 F.2d 815, 830 (4th Cir. 1990) (joinder of mail fraud and tax fraud counts proper where defendant failed to report proceeds from fraudulently-obtained loans to Internal Revenue Service).

In short, considering the fraud/identity theft charges apart from the drug/firearm charges would "paint[ ] an incomplete picture" of Defendant's criminal activity. *Cardwell*, 433 F.3d at 385. Given the logical relationship between all of the charges, joinder is appropriate under Rule 8(a).

Joinder of all of the charges also reduces the waste of judicial resources and promotes the efficient administration of justice.  As the Fourth Circuit has stated, the "'prospect of duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources suggests that related offenses should be tried in a single proceeding.'" *Hawkins*, 776 F.3d at 206 (quoting

*Mir*, 525 F.3d at 357). Indeed, if severance were granted, the United States would essentially be required to present much of the same evidence at separate trials, including: (1) evidence regarding the Defendant's arrest of January 23, 2020; (2) evidence regarding the execution of the search warrants at Defendant's residence that same day; (3) evidence regarding Defendant's statement to investigators; (4) evidence regarding the contents of Defendant's six electronic devices; (5) evidence regarding the content of Defendant's multiple online electronic accounts; (6) evidence regarding historical cell site location data of Defendant's devices; and (7) evidence regarding Defendant's financial accounts and activity. Simply put, the "efficiency in trying [Defendant] on related counts in the same trial" is substantial. *Cardwell*, 433 F.3d at 385.

### 2. Joinder Will Not Have a Prejudicial Effect Warranting Severance.

Nor is severance warranted. Even where joinder is proper, Fed. R. Crim. Proc. 14(a) allows a court to sever joined counts if joinder would prejudice the defendant. But the Supreme Court has held that a "court should grant severance under Rule 14 only if there is a serious risk that a joint trial would … prevent the jury from making a reliable judgment about guilt or innocence." *United States v Cardwell*, 433 F.3d 378, 387 (4th Cir. 2005) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)) (emphasis added). Accordingly, severance is rare. *Cardwell*, 443 F.3d at 387. The defendant moving for severance bears "the burden of demonstrating a strong showing of prejudice". *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984).

Courts have frequently held that "speculative allegations"—allegations such as those made by Defendant here[14]—are insufficient to satisfy the actual prejudice standard. *See United States v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2002); *United States v. Becker*, 585 F.2d 703, 707 (4th Cir.

---

[14] Defendant only makes a single, passing reference to "prejudice" in the Motion to Sever. ECF No. 50 at 8.

1978) ("Speculative allegations as to possible prejudice do not meet the burden of showing an abuse of discretion in denying a motion for severance.")

Defendant does not address at all how any risk of prejudice would not be alleviated with an appropriate limiting instruction. *Id.* Specifically, the Court can minimize any alleged prejudice by giving a jury instruction noting that a separate crime is charged in each count of the superseding indictment, that each charge, and the evidence pertaining to it, should be considered separately, and that the fact that the jury may find the defendant guilty or not guilty as to one of the counts should not control their verdict as to any other count. The Fourth Circuit has concluded repeatedly that this type of limiting instruction alleviates potential prejudice that might arise from a joint trial on all offenses. *See United States v. Mir*, 525 F.3d 351, 357-58 (4th Cir. 2008) (holding that limiting jury instruction (which the defendant refused) in a case involving fraud and witness tampering would have sufficiently prevented any prejudice coming from joinder); *United States v. Taylor*, No. 06-4137, 2007 WL 570409, at *2 (4th Cir. February 16, 2007) (affirming district court's denial of defendant's severance motion, in part, based on trial court's limiting instruction); *United States v. Cole*, 857 F.2d 971, 974 (4th Cir. 1998) (same); *see also* United States *v. Okun*, No. 3:08cr132, 2009 WL 414012 *7-8 (E.D.Va. Feb. 18, 2009) (finding that defendant's unsupported assertion of prejudice stemming from the jury's "evidentiary mixing" was insufficient and, further, that defendant failed to show that "that the presumption that a curative instruction is sufficient has been overwhelmed").

Accordingly, the interests of speed, efficiency, and convenience of the judiciary outweigh the groundless and speculative assertions about potential prejudice made by Defendant in his motion. The Court should deny Defendant's Motion to Sever.

**CONCLUSION**

For all of the above reasons, Defendant's motions should be summarily denied without a hearing.

Respectfully submitted,

EREK L. BARRON
United States Attorney

By:    _____/s/_____

Paul A. Riley
Assistant United States Attorney
36 S. Charles Street, 4th Fl.
Baltimore, Maryland 21201